## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RECCO FORD,                                   :
                                              :
                    Plaintiff,                :        CIVIL ACTION
          v.                                  :
                                              :
CITY OF PHILADELPHIA, *et al.*,               :        NO. 12-2160
                                              :
                    Defendants.               :
                                              :
                                              :

### MEMORANDUM

BUCKWALTER, S. J.                                                      July 24, 2012

Presently before the Court is the Motion of Defendant City of Philadelphia[1] ("Defendant" or

"the City") to partially Dismiss the Complaint of Plaintiff Recco Ford ("Plaintiff" or "Ford").  For

the following reasons, the Motion is granted in part and denied in part.

## I.        FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter arises out of the investigation, prosecution, and ultimate acquittal of Plaintiff

Ford for first-degree murder charges.  According to the facts set forth in the Complaint, at the time

of the underlying action, Plaintiff was a sixteen-year-old student that resided with his mother in

Southwest Philadelphia.  (Compl. ¶ 24.)  On the afternoon of April 12, 2007, nineteen-year-old Leon

Blackwell was sitting on a bench in a playground at the Kingsessing Recreation Center with his two

---

[1] Although not parties to the instant Motion, the following individuals are also listed as Defendants in this action: Detectives Robert Hagy, Matthew Farley, Omar Jenkins, Daniel Brooks and John Verrecchio; Sergeants Charles Layton and Himmons; Lieutenants Williams and Walker; Police Officers Daniel Lloyd, Darnell Young and James Cook.  (Compl. ¶¶ 10–21.) These officials are being sued in their individual capacities.  (Id.)

friends, Q.T. and J.V.[2]  (Id. ¶¶ 25, 51.)  Ford was not at the playground at the time.  (Id. ¶ 27.)  At approximately 4:30 p.m., an unidentified male approached Blackwell with a gun and fired multiple gunshots at his head and face.  (Id. ¶ 26.)  The shooter then fled the scene.

Several local Philadelphia residents heard the gun shots and immediately called 911.  (Id. ¶ 29.)  Philadelphia police officers arrived at the scene within minutes.  (Id. ¶ 30.)  Blackwell was taken to the hospital by emergency personnel, and the officers began to collect information and interview witnesses.  (Id. ¶ 31.)  Emergency radio dispatchers also began to broadcast information about potential suspects to police officers on patrol in the area.  (Id. ¶ 34.)  Officer James Cook received information that Q.T. and K.V. were sitting alongside Blackwell in the playground at the time of the shooting, and therefore detained them so that they could be taken to the Philadelphia Police Department's Southwest Detective Division ("SWDD") headquarters for further questioning. (Id. ¶¶ 32, 33.)  A few minutes later, a young female, Ro. W., reported to 911 dispatchers that she had witnessed the shooter fleeing the scene, and described him as a man with "medium brown skin" wearing jeans and a tan jacket with graphics on the back.  (Id. ¶¶ 35, 102, 103.)  This information was broadcast over the police radio, and a male matching the description was stopped at a nearby location.  (Id. ¶¶ 36, 37.)  Shortly thereafter, Officer Cook and Detective Omar Jenkins received a different description of the shooter from an eyewitness, and broadcast over the police radio that the suspect was a tall, black male with a thin build, and was wearing tan pants and a green windbreaker. (Id. ¶ 38.)  Within a few minutes of the latter broadcast, a male matching that description was also stopped at a nearby location.  (Id. ¶ 39.)  Several minutes later, Officer Cook once again dispatched a different description, stating that the suspect was believed to be a black male named B.G. and was

---

[2] All individuals referred to by their initials in this Memorandum are minors.

wearing tan pants and a blue-hooded sweatshirt.  (Id. ¶ 40.)  Two males matching this description were eventually detained by Philadelphia police officers.  (Id. ¶¶ 41, 42.)

After these various individuals were detained and/or taken into police custody, a woman at the scene approached Officer Cook and told him that an anonymous source had informed her that Ford was the person who shot Blackwell at the playground.  (Id. ¶ 43.)  Officer Cook relayed this information to the SWDD Special Investigations Unit charged with investigating the shooting.  (Id. ¶ 45.)  The particular SWDD unit at issue was comprised of Detectives Robert Hagy, Matthew Farley, and Daniel Brooks, Sergeant Charles Layton, and Lieutenant Walker.  (Id.)  Upon receiving the information regarding Ford, the SWDD Unit focused its investigation on him as the potential shooter.  (Id. ¶ 46.)  According to the Complaint, the officers and detectives made no further attempt to investigate the other males that were detained as suspects near the scene, and also failed to conduct follow-up interviews of the other eyewitnesses that were present at the scene.  (Id. ¶¶ 47–50.)

Meanwhile, Q.T. and K.V. had been transported to SWDD headquarters for further questioning.  At the station, both juveniles were placed in separate locked interview rooms and told that they were guilty of conspiracy to commit murder.  (Id. ¶¶ 53, 54.)  Their requests to contact their parents were allegedly denied, and they were advised that their parents could not help them.  (Id. ¶ 54.)  When their parents contacted the station, they were told that Q.T. and K.V. were not being held there.  (Id. ¶¶ 55, 56.)  Q.T. and K.V. were held for more than two hours in their separate interrogation rooms prior to being interviewed.  (Id. ¶¶ 53, 57.)  Eventually, both juveniles were individually presented with a photo spread including a photo of Ford, and were "demanded" to identify him as Blackwell's shooter.  (Id. ¶¶ 58, 65.)  When both individuals separately stated that

Ford was not the shooter, they were allegedly threatened that if they did not identify Ford as the shooter, they would not be permitted to leave SWDD headquarters and would be prosecuted for conspiracy to commit murder and receive life sentences.  (Id. ¶¶ 59, 60, 66, 67.)  Faced with this threat, Q.T. and K.V. thereafter identified Ford as the shooter.  (Id. ¶¶ 61, 68.)  Following Q.T. and K.V.'s identifications, Detectives Farley and Jenkins allegedly prepared fabricated written statements indicating that the two juveniles had voluntarily identified Ford as Blackwell's shooter.  (Id. ¶¶ 62, 69.)  Q.T. and K.V. were subsequently coerced into signing the false written statements.  (Id. ¶¶ 63, 70.)

Based on Q.T. and K.V.'s false identifications of Ford, Detective Hagy prepared and filed an affidavit of probable cause seeking a search warrant for Plaintiff's home.  (Id. ¶ 71.)  On the evening of April 12, 2007, several officers executed the search warrant and searched Ford's home.  (Id. ¶ 73.)  No evidence of the crime, however, was discovered there.  (Id.)

Two days later, on April 14, 2007, Blackwell died as a result of his multiple gunshot wounds.  (Id. ¶ 75.)  Due to his death, investigation of the case was transferred to the Philadelphia Police Department's Homicide Division, and the case file was assigned to Detective John Verrecchio and Lieutenant Williams.  (Id. ¶ 76.)  That same day, Detective Verrecchio prepared and filed an affidavit of probable cause seeking an arrest warrant for Ford based exclusively on the information previously provided by Detective Hagy when seeking the search warrant.  (Id. ¶ 78.)  A warrant for Ford's arrest was subsequently issued.  (Id. ¶ 82.)

On April 28, 2007, Ford voluntarily surrendered himself to SWDD.  (Id.)  He was arrested, placed in custody, and held without bail.  (Id.)  Ford's preliminary hearing took place on September 5, 2007.  (Id. ¶ 83.)  Q.T. and K.V. received subpoenas to appear at the hearing, and both testified

that they were coerced into signing false statements identifying Ford as the shooter. (Id. ¶¶ 84–86.) Both witnesses further testified that the actual shooter was a tall, thin male whom they did not know. (Id. ¶ 87.)

During the discovery phase of pre-trial proceedings, the aforementioned officers and detectives failed to disclose to prosecutors the events surrounding Q.T. and K.V.'s identifications, as well as a compact disc that contained recordings of all the police dispatch broadcasts from the day of the shooting. (Id. ¶ 90.) Ford's defense counsel also never received information concerning the various eyewitness reports that had been given at the scene. (Id. ¶ 91.) Upon further investigation, defense counsel developed a theory that another juvenile male, "J.A.," could actually have been Blackwell's shooter. (Id. ¶ 92.) Evidence unveiled during this time revealed that J.A. matched the description of the shooter provided by Q.T. and K.V. at the preliminary hearing, and that J.A. and his younger relative D.W. had been taken into police custody on the day of the shooting. (Id. ¶¶ 93, 94.) No one at the Philadelphia Police Department had previously disclosed this information to the prosecution. (Id. ¶ 96.) Therefore, when defense counsel requested the prosecution to provide it with all evidence related to J.A. and D.W., the prosecution advised that neither individual had been stopped or investigated by police that day. (Id.)

Ford's trial for first degree murder commenced in the Court of Common Pleas in Philadelphia on September 30, 2008. (Id. ¶ 97.) On the second day of jury selection, the prosecution provided defense counsel with new evidence that had just been disclosed to it by the aforementioned officers and detectives, including: the compact disc containing the police radio dispatcher recordings from April 12, 2007, police reports stating that J.A. and D.W. were taken into police custody on that day, and a note handwritten by Detective Hagy which stated that Blackwell's father told police that

he knew where the "doer" of the shooting was located.  (Id. ¶ 98.)  As a result of this newly disclosed evidence, the Common Pleas Court declared a mistrial and continued the case.  (Id. ¶ 99.)

Further investigation into the matter subsequently revealed that Sergeant Himmons and Officers Lloyd and Young had transported J.A. and D.W. to SWDD on the day of the shooting, but released them from custody shortly thereafter.  (Id. ¶ 100.)  Defense counsel was also able to locate Ro. W. and Ra. W, the initial witnesses of the shooting, and both confirmed that Ford was not the shooter.  (Id. ¶¶ 102, 103.)  Both Ro. W. and Ra. W. also confirmed that neither had been contacted by the police following their initial eyewitness reports.  (Id. ¶ 104.)

Plaintiff's new trial in the Court of Common Pleas commenced on May 3, 2010.  (Id. ¶ 105.) The trial resulted in Ford's acquittal on all charges on May 17, 2010.  (Id. ¶ 106.)  Plaintiff was incarcerated in the Philadelphia Prison System between the dates of his initial arrest in 2007 and his eventual acquittal in 2010.  (Id. ¶ 113.)  He was released from incarceration at nineteen years of age. (Id.)  As a result of his allegedly unnecessary imprisonment, Plaintiff avers that he suffers from emotional distress and trauma, loss of enjoyment of life, personal infliction of physical injury as a result of his anxiety and depression, headaches, restricted breathing, uncontrolled sweats, sleeplessness, nightmares, and financial losses.  (Id. ¶ 114.)

Plaintiff filed the instant civil rights action in federal court on April 23, 2012, alleging that Defendants violated his rights under the United States Constitution, as well as state law claims alleging false arrest, false imprisonment, malicious prosecution, and civil conspiracy.  Defendant City of Philadelphia filed the instant Motion to Dismiss on May 18, 2012, and Plaintiff responded in opposition on June 7, 2012.  This issue is now ripe for judicial consideration.

6

## II.     LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).  In Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  It emphasized that it would not require a "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  Id. at 570.

In the subsequent case of Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court enunciated two fundamental principles applicable to a court's review of a motion to dismiss for failure to state a claim.  First, it noted that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 678.  Thus, although "[Federal] Rule [of Civil Procedure] 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id. at 678–79.  Second, the Supreme Court emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. at 679.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

Notwithstanding the foregoing, nothing in Twombly or Iqbal has altered some of the

7

fundamental underpinnings of the Rule 12(b)(6) standard of review.  Arner v. PGT Trucking, Inc., No. Civ.A.09-0565, 2010 WL 1052953, at *2 (W.D. Pa. Mar. 22, 2010); Spence v. Brownsville Area Sch. Dist., No. Civ.A.08-0626, 2008 WL 2779079, at *2 (W.D. Pa. July 15, 2008).  Federal Rule of Civil Procedure 8 requires only a short and plain statement of the claim showing that the pleader is entitled to relief and need not contain detailed factual allegations. Fed. R. Civ. P. 8; Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  Further, the court must "accept all factual allegations in the complaint as true and view them in the light most favorable to the plaintiff."  Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006).  Finally, the court must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Pinkerton v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002).

## III.    DISCUSSION

In the instant case, Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, alleging that the City of Philadelphia violated his constitutional rights by depriving him of a fair trial and due process of law, subjecting him to malicious prosecution, and failing to disclose exculpatory evidence to the prosecution as required by Brady v. Maryland, 373 U.S. 83 (1963).  Defendant City of Philadelphia moves to partially dismiss Plaintiff's Complaint on the basis that he has failed to establish the existence of constitutional violations on the City's part pursuant to 42 U.S.C. § 1983.  More specifically, Defendant avers that the City cannot be held liable under a theory of municipal liability.[3]

---

[3] Defendant likewise seeks to dismiss Plaintiff's state law claims of false arrest and false imprisonment on the basis that these claims have been barred under the applicable statute of limitations.  In his Response in Opposition, Plaintiff concedes that dismissal of his false arrest and false imprisonment claims is appropriate under these circumstances.  (See Pl.'s Resp. Opp'n 1.)  As such, these two claims are dismissed from suit.

Section 1983 provides, in relevant part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.  The statute itself does not independently create substantive rights, but rather merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." Kopec v. Tate, 361 F.3d 772, 775–76 (3d Cir. 2004) (internal citation omitted); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 284–85 (2002); Bush v. Lancaster City Bureau of Police, No. Civ.A.07-3172, 2008 WL 3930290, at *3 (E.D. Pa. Aug. 26, 2008).  Federal law requires a plaintiff to satisfy two steps  in order to properly establish a § 1983 claim: (1) the deprivation of a constitutional right or other federal law, and (2) that a "person acting under the color of state law" is responsible for the alleged deprivation.  Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992).

In the seminal case of Monell v. Department of Social Services, 436 U.S. 658 (1978), the Supreme Court of the United States held that § 1983 applies to municipalities and other local government units.  Id. at 690.  To impose § 1983 liability on such a governing body, the plaintiff must identify either a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the [body's] official decision-making channels." Id. at 659.  However, "it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality." Bd. of the Cnty.

9

Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997).  Rather, the plaintiff must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.  Id.; see also Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (plaintiff carries burden of demonstrating a "plausible nexus" or "affirmative link" between the municipality's custom or policy and the constitutional deprivation challenged) (internal citation and quotations omitted).

One way that a plaintiff can establish such an official policy is by demonstrating that the governing body maintained a policy of inadequate training or supervision.  City of Canton, Ohio v. Harris, 489 U.S. 378 (1989).  In Canton, the Supreme Court held that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality . . . can a city be liable for such a failure under section 1983."  Id. at 389.  Once a plaintiff identifies a municipal policy, he must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  Brown, 520 U.S. at 404.  If the policy does not facially violate federal law, causation can only be established by "demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  Id. at 407 (internal citations omitted); see also Frohner v. City of Wildwood, No. Civ.A.07-1174, 2008 WL 5102460, at *11 (D.N.J. Dec. 1, 2008).  The Supreme Court has cautioned, however, that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees."  Brown, 520 U.S. 397, 405 (1997).

In the instant case, Plaintiff contends that the City maintained a policy, practice or custom that failed to account for additional or different training, supervision, investigation, or discipline that related to:

> (a) Legal cause to stop, detain, and/or arrest a citizen; (b) police officers' duties and responsibilities to engage in proper investigative techniques; (c) proper police procedure for interviewing juvenile witnesses to a crime; (d) police officers' duties not to coerce witnesses into identifying a suspect; (e) police officers' constitutional duties to disclose to the prosecution exculpatory information; (f) the failure to identify and take remedial or disciplinary action against police officers who were the subject of prior civilian or internal complaints of misconduct; (g) the hiring and retention of officers who are unqualified for their employment position; and (h) the failure to properly sanction or discipline officers who are aware of and conceal and/or aid and abet violations of constitutional rights of citizens by other Philadelphia police officers.

(Compl. ¶ 118 (a–h).)  Defendant contends that these allegations are nothing more than "threadbare recitals of the elements of a cause of action," and that Plaintiff "appears to take a scattershot approach by launching a barrage of legal conclusions at the wall to see which ones will stick." (Def.'s Mot. Dismiss 8.)  More specifically, Defendant avers that Ford's Monell claim must be dismissed because he has not identified a precise policy, practice, or custom which demonstrates that the City was deliberately indifferent to his constitutional rights.  (Id.)

The Court disagrees.  In order for Ford to prevail on his municipal liability claim, he needs to show that the City was deliberately indifferent "to the rights of people with whom the police c[a]me into contact."  Canton, 489 U.S. at 388.  To properly do so, Ford must establish that the City had a pattern of engaging in constitutional violations such as those present in this case, and that this pattern lead to his eventual constitutional injuries.  Carswell v. Borough of Homestead, 381 F.3d 235, 244 (3d Cir. 2004) (citing Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000)).  Ford cannot, however, prove such a pattern without a sufficient period of discovery to adduce this evidence.  See Keahey v. Bethel Twp., No. Civ.A.11-7210, 2012 WL 478936, at * 10 (E.D. Pa. Feb. 15, 2012) (declining to dismiss municipal liability claim because claimant had not yet had opportunity to conduct discovery).  As such, Plaintiff's claim that the City maintained a policy that

11

failed to properly train, supervise, investigate, or discipline its officers is still too premature for the Court to dismiss from suit at this time.   Accordingly, Defendant's request for dismissal on these grounds is denied.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is granted in part and denied in part.  Specifically, Defendant's request to dismiss Plaintiff's false arrest and false imprisonment state law claims is granted, as Plaintiff concedes that these claims are barred by the applicable statute of limitations.  However, Defendant's request to dismiss Plaintiff's municipal liability claim pursuant to § 1983 against the City of Philadelphia is denied.

An appropriate Order follows.